**CASE NO. 25-1770**

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

**POPPLETON NOW COMMUNITY ASSOCIATION, INC., ET AL.**

**Plaintiffs/Appellants,**

**v.**

**LA CITE DEVELOPMENT, LLC ET AL.**

**Defendants/Appellees.**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND (BALTIMORE DIVISION)**

---

**APPELLANTS' OPENING BRIEF**

---

**Dated: August 18, 2025**

**SAUL EWING, LLP
Thomas K. Prevas
Saul Ewing LLP
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
(410) 332-8683
thomas.prevas@saul.com**

**Katherine S. Barrett Wiik
33 South 6th St,
Minneapolis, MN 55402
katie.barrettwiik@saul.com**

**Counsel for Appellants *Poppleton Now,
Inc., Curtis Eaddy Sr. & Sonia Eaddy;
Sterling Walker & Francina Walker and
William Gunn & Yvonne Brooks Gunn***

## TABLE OF CONTENTS

**Page**

I.    JURISDICTIONAL STATEMENT ..............................................................1

II.   STATEMENT OF ISSUES ON APPEAL.....................................................2

III.  STATEMENT OF THE CASE ....................................................................3

IV.   STANDARD OF REVIEW...........................................................................8

V.    SUMMARY OF ARGUMENT.....................................................................9

      *1.   The Individual Appellants Have Standing..............................................9*

      *2.   Poppleton Now Community Association Has Standing.........................9*

      *3.   The Individual Appellants Have Pleaded a Viable Nuisance
      Claim ...................................................................................................10*

      *4.   Appellants Have Pleaded a Viable Case for Declaratory
      Judgment, Which the District Court Overlooked...............................11*

VI.   ARGUMENT...............................................................................................12

      *1.   Appellants Have Article III Standing Because They Have
      Pleaded Facts Demonstrating that They Experience Direct and
      Special Harm Traceable to the LDDA that Would Be
      Remediated by Court Order...............................................................12*

      *2.   Appellant Poppleton Now Has Associational Standing. ...................26*

      *3.   The Individual Property Owners Have Validly Pled a Case of
      Nuisance against the City and the Developer....................................29*

      *4.   The Court Failed to Address Appellants' Claims for
      Declaratory Relief, which is the Crucial Relief Sought....................33*

VII.  CONCLUSION ..........................................................................................34

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*1000 Friends of Maryland v. Browner*, 265 F.3d 216 (4th Cir. 2001)..19, 20, 24, 27

*Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505 (4th Cir. 2003)................13

*Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150 (1970) ..........13

*Benton Franklin Riverfront Trailway and Bridge Committee v. Lewis*, 701 F.2d 784 (9th Cir. 1983)....................................................................................17

*Citizens Against Rails-to-Trails v. Surface Transp. Bd. ("STB")*, 267 F.3d 1144 (D.C. Cir. 2001) ....................................................................................17

*Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59 (1978) ....18

*Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F. 3d 642 (4th Cir. 1999) ...........................................................................................................8

*Frank Krasner Enters. v. Montgomery Cnty.*, 401 F.3d 230 (4th Cir. 2005)............8

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th Cir. 2000) ...............................................................................18, 19, 24

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000)...........................................................................9, 26, 27

*Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979)........................14, 15

*Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982) ........................14, 15

*Hunt v. Washington State Apple Advertising Com'n,* 431 U.S. 333 (1977)............26

*Kelo v. City of New London*, 545 U.S. 469 (2005) ....................................................4

*King v. Rubenstein*, 825 F.3d 206 (4th Cir. 2016)..............................................8, 29

*Lujan v. Defender's of Wildlife*, 504 U.S. 555 (1992).....................................passim

*Miller v. Brown*, 462 F.3d 312 (4th Cir. 2006)........................................................8

*Nat'l Fair Housing Alliance v. Bank of America*, 401 F. Supp. 3d 619 (D. Md. 2019) ........................................................................................32

*Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012 (6th Cir. 1989) ........................................................................................16

*Neighborhood Development Corp. v. Advisor Council on Historic Preservation, Dept.of Housing and Urban Development, City of Louisville*, 632 F. 2d (6th Cir. 1980) ........................................................................................16

*SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015).................29

*Sierra Club v. Mortin*, 405 U.S. 727 (1972) ....................................................13, 14

*Sierra Club v. United States Dept. of Interior*, 899 F.3d 260 (4th Cir. 2018)...20, 21

*Society Hill Towers Owner's Ass'n v. Rendell*, 210 F.3d 168 (3rd Cir. 2000)........15

*South East Lake View Neighbors v. Dept. of Housing and Urban Development*, 685 F.2d 1027 (7th Cir. 1982) ................................................................16

*Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402 (4th Cir. 2011)............8

*Town of Chester, N.Y v. Laroe Estates, Inc.*, 581 U.S. 433 (2017) .........................33

*Waterford Citizens' Ass'n v. Reilly*, 970 F.2d 1287 (4th Cir. 1992) ......................17

STATE CASES

*120 W. Fayette St. LLLP v. Mayor and City Council of Baltimore*, 407 Md. 253 (2009) .....................................................................21, 22, 33

*ExxonMobil v. Albright*, 433 Md. 303 (Md. 2013)..................................................31

*Patuxent Riverkeeper v. Maryland Dep't Env't*, 422 Md. 294 (2011) ..............12, 26

FEDERAL RULES AND STATUTES

28 U.S.C. § 1291 .......................................................................................................1

42 U.S.C. § 1983 .................................................................................................11, 32

Federal Rules of Civil Procedure Rule 12(b)(1)..................................................8, 34

Federal Rules of Civil Procedure Rule 12(b)(6)................................................11, 32

5th Amendment to the United States Constitution .............................................1, 2, 6

Article III of the United States Constitution......................................................*passim*

**STATE STATUTES**

Maryland Constitution and Declaration of Rights......................................................6

**OTHER AUTHORITIES**

*13A Wright and Miller, Federal Prac. & Proc.* § 3531.1 & § 3531.4
   (3d ed. 2008)…………………...................................................................13, 15

## I.  JURISDICTIONAL STATEMENT

This Court has appellate jurisdiction pursuant to 28 U.S.C. §1291. This case concerns 13.8 acres of property in the center of the Poppleton neighborhood in Baltimore, City, Maryland (located approximately one mile directly west of the Garmatz federal courthouse in Baltimore City), which was taken by the City from private homeowners and encumbered in a Land Disposition and Development Agreement ("LDDA") between Baltimore City (the "City") the Developer.[1] Appellants allege, among other things, that the LDDA is unenforceable because it is unconstitutional as against the takings and public use clauses of the 5th Amendment to the United States Constitution thereby creating a federal question.  Appellant Poppleton Now Community Association Inc. ("Poppleton Now") is a community association located in the Poppleton neighborhood with a primary purpose of promoting the interest of the neighborhood, and its membership contains homeowners in the Poppleton neighborhood. JA052. Appellants Curtis and Sonia Eaddy, Sterling and Francina Walker and William and Yvonne Brooks Gunn (collectively the "Individual Appellants") each live in the Poppleton neighborhood and their homes are adjacent to the 13.8 acres of land that are the subject of this suit; they also are each members of Poppleton Now. JA053-055.  Appellants timely

---

[1] The "Developer" Defendants are La Cite, LLC, Poppleton Development I, LLC, PSH 1B, LLC and Dan Blythewood.  JA003-JA004.

appealed from a final order of the United States District Court for the District of Maryland (Abelson, J.) dismissing the case primarily for lack of standing (the "District Court Order"). *See* JA433.

## II.    STATEMENT OF ISSUES ON APPEAL

Appellants state the issues on appeal as follows:

1.    Do the Individual Appellants have standing to sue over a contract between Appellee City of Baltimore and Appellee Developer that they allege violates the public use clause of the Fifth Amendment to the United States Constitution and is otherwise unenforceable under Maryland law, when the contract concerns 13.8 acres of land directly adjacent to their homes, they have pleaded that it materially and adversely impacts the aesthetic and social fabric of the neighborhood in which they live and recreate; they have pleaded that it materially depreciates the use and enjoyment and market value of their homes; and they seek a declaratory judgment invalidating the contract to alleviate these harms?

2.    Does the Appellant Poppleton Now Community Association, whose members are residents who live in the neighborhood and whose purpose is to promote the interests of the neighborhood, have associational standing to sue over the same contract?

3.    Did the district court err by ruling on a motion to dismiss that the Individual Appellants failed to plead a claim for private nuisance, when Appellants pleaded that City and the Developer unreasonably and unlawfully destroyed 13.8 acres of homes in their residential neighborhood without any public use and now unreasonably leave the land fallow to accumulate trash, dumping, rubble, rats and weeds (among numerous other pled harms), causing Plaintiffs to lose the use and enjoyment and property value of their homes?

4.    Did the district court err by failing to address the Plaintiffs request for Declaratory Judgment on the constitutionality and legality of the contract between the City and the Developer?

-2-

## III.    STATEMENT OF THE CASE

This is an appeal from the district court dismissing Appellants' Complaint for the lack of Article III standing and for failure to state a claim upon which relief can be granted as to the nuisance count. Although the analysis was not done, Appellants must assume that their declaratory judgment count also was dismissed on standing grounds.  Appellants do not seek review of the dismissal of Sheila Dixon and HABC.

This case involves Appellants unique and "special" interest in taking-back their neighborhood from a developer who offered a former City Council President (later Mayor) in-kind gifts in exchange for a sweetheart deal that caused the City to "take" 13.8 acres of private property and give it to him.  Now, almost twenty years after the first LDDA, evolved though LDDA amendments, the Developer currently maintains that the LDDA confers upon him a perpetual "Development Right" across all 13.8 "taken" acres, granting him the power to develop the land however and whenever he sees fit, the power to determine the "public use," and, most detrimentally, the power to force the City or anyone else who wishes to develop it to pay him the entire market value of the "taken" land, even though he has delivered absolutely nothing of value and does not even own the land. JA033.  Recently, the City started inexplicably paying him the fair market value to take limited parcels out of the LDDA, which has only emboldened him to hold the remaining 13.8 acres hostage, even though he has no lawful right to do so. Appellants maintain that a

declaratory order of the court interpreting the rights of the parties under the LDDA (as amended) and otherwise declaring the LDDA (in whole or in part) unenforceable would remove a substantial obstacle to restoring the aesthetic and social fabric of their community, as well the property values and the use and enjoyment of their homes, and would open the door to the delivery of the public use that is constitutionally and legally required. *See* JA047-JA048, JA068-JA073.

The United States Supreme Court forecasted the unconstitutional transaction between the City and this Developer in *Kelo v. City of New London*, 545 U.S. 469, 849 (2005). There, a split United States Supreme Court ruled that private property could sometimes be taken for community development purposes under limited circumstances. Four justices would have ruled that the right to be free from governmental interference with private property is so fundamental that a government never should be permitted to take private property from one private person just to give it to another, who might be politically-favored, and that "community development" is not a public use within the meaning of the Fifth Amendment's Public Use Clause. *Id.* at 496. (O'Conner, J, dissenting). Four other justices would have ruled that government can take property for neighborhood redevelopment purposes, but only if pursuant to a clearly articulated plan and the public use is ensured. *Id.* at 483-84 (Stevens, J.). Justice Kennedy, who cast the deciding vote, wrote that he would allow the private property transfer in *Kelo*, but stated that these

-4-

transactions should be highly scrutinized by courts, particularly if there is any indicia of untoward political influence:

> There may be private transfers in which the risk of undetected impermissible favoritism of private parties is so acute that a presumption (rebuttable or otherwise) is warranted under the Public Use Clause. . . . There may be categories of cases in which the transfers are so suspicious, or the procedures so prone to abuse, or the purported benefits are trivial or implausible, that courts should presume and impermissible private purpose. . . .

*Id.* at 7933 (Kennedy, J., concurring). Justice Kennedy anticipated the instant case.

Almost 20 years ago, Baltimore City entered into the LDDA with the Developer promising to "take" 13.8 acres of private property and tear down the houses to allow the Developer to build houses where houses stood for purported "community development purposes." JA020, ¶17. The shockingly one-sided LDDA (now, as amended) memorializes a private inurement transaction. JA020, ¶16. Last summer, it came to light that the RFP award and LDDA were entered-into after the Developer had provided a full day of spa treatments and a spread in a national magazine to then City Council President, later Mayor, Sheila Dixon—who served as mayor of Baltimore until resigning as part of a federal guilty plea for having accepted gifts from a different developer at this time. JA019-020, ¶¶13-14; JA078-JA092.

Now, almost twenty years later, 500 plus private homes in this historic black neighborhood have been "taken" and destroyed, and the land is empty and owned by Baltimore City. But the unconstitutional and illegal terms of the LDDA between

Baltimore and this Developer persists and continue to cause substantial harm to Appellants and the Poppleton community. In another recent development, the City acquiesced on two occasions to the Developer's illegal and unconstitutional demands and actually paid him full market value for two limited parcels so that the City could develop its own "taken" land without the Developer's involvement. JA021, ¶22. By taking the path of least resistance, the City sought to correct a prior improper action with a new improper action, which only served only to emboldened the Developer to assert authority and a right to payment over the remaining 13.8 "taken" acres adjacent to Appellant's homes. JA023.

Neither the Fifth Amendment of the United States Constitution nor the Maryland Constitution, Maryland Declaration of Rights and other Maryland laws (including the law that the public use my be re-examined every four years and the rule against perpetuities), countenance the Developer's asserted private and perpetual "Development Right" at the center of this controversy. And while the existence of this right and the terms of this one-sided LDDA might be offensive or shocking to the average citizen of Baltimore or a law professor, such persons would not have Article III standing to challenge the LDDA. Appellants do.

The Complaint explains that the Individual Appellants own property <u>directly adjacent</u> to the 13.8 acres of empty land now owned by Baltimore City in the heart of the Poppleton Community. JA027-JA028. Appellants allege that the LDDA

-6-

creates an urban wasteland and destroys the aesthetic and social fabric of their community. JA039, ¶98. Appellants also suffer the rubble, trash, weeds, rats and illegal dumping that flow from 13.8 acres being left vacant and unoccupied in the center their community, which further results in loss of property value and the use and enjoyment of their homes. JA039, ¶98. The Poppleton Now Community Association, a non-profit organization, consists both of members who lost their homes, those who continue to remain, and persons new to the neighborhood, and the purpose of the Poppleton Community Association, as with any neighborhood association, is to promote general health and welfare of the neighborhood. JA027, ¶41. Appellants are specially affected by the LDDA, the condition of their neighborhood is traceable to the LDDA, and Appellants have the most to gain by a court order declaring the LDDA unenforceable. Indeed, it is the people who remain in the neighborhood today—not the people who were removed (however unfairly)—who suffer the present-day harms caused by the LDDA Agreement.

Appellants, therefore, ask this Court to reverse the district court's order dismissing this case. The Court should recognize that Appellants have Article III standing to bring these claims and should remand the case to the district court for further proceedings on the interpretation and enforceability of the LDDA between the City and the Developer, as more particularly set forth in Claims I (Public Use/Takings Law), IV (Nuisance) and VII (Declaratory Judgment) of the Complaint.

-7-

Appellants do not appeal those parts of the District Court's Order that dismiss Defendants HABC, Janet Abrahams and Sheila Dixon. Appellants further do not contest the dismissal of Counts II, III and VI of the Complaint.[2] Once remanded, Appellants will seek leave to narrow the Complaint to make it consistent with the narrowed scope of this appeal. On all claims appealed, the Court should reverse.

## IV.    STANDARD OF REVIEW

This Court reviews *de novo* a District Court's dismissal for lack of subject matter jurisdiction. *See Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 408 (4th Cir. 2011). It also reviews *de novo* a district court's dismissal for lack of standing and ripeness. *Frank Krasner Enters. v. Montgomery Cnty.*, 401 F.3d 230, 234 (4th Cir. 2005); *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006).

A Court "should grant a Rule 12(b)(1) motion to dismiss 'only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.'" *Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F. 3d 642, 647 (4th Cir. 1999). When considering a motion to dismiss for failure to state a claim, the Court must "accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, at 212 (4th Cir. 2016).

---

[2] Count V does not exist in the Complaint.

-8-

## V.    SUMMARY OF ARGUMENT

### 1.    The Individual Appellants Have Standing.

Individual Appellants easily allege Article III standing.  A <u>trove</u> of federal cases on Article III standing—as well a Maryland case on all-fours factually—authorize Appellants to bring this claim.  The Individual Appellants allege that (i) they are property owners living <u>directly adjacent</u> to the 13.8 Acres of land subject to the LDDA; (ii) the LDDA (or the "Developer Right" component thereof) constitutes a purely private inurement of "taken" property, is otherwise illegal and unenforceable and that the LDDA actually prevents the land from being developed in the public use; (iii) harm to Appellant's can be traced directly to the City and Developer's actions, which include the existence and terms of the LDDA, and (iv) a Court order declaring the LDDA unenforceable or interpreting the "Developer Right" not to exist, would materially benefit the neighborhood by releasing 13.8 acres the Developer captivity, thereby allowing the obligatory public use or another benefit to occur.

### 2.    Poppleton Now Community Association Has Standing.

An association has standing "to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S.

167, 181, (2000); *citing Hunt v. Washington State Apple Advertising Com'n,* 431 U.S. 333, 343 (1977).  The Poppleton Now Community Association is a not-for-profit Maryland corporation located in the Poppleton community of Baltimore City with the primary purpose of bettering the Poppleton neighborhood and advocating for the rights and desired uses of current and former neighbors, including those who were displaced by the development and those who continue to live in the neighborhood.  JA027, ¶41.  Contesting the LDDA with the City and the Developer is germane to the organization's purpose.  Individual Plaintiffs are members of Poppleton Now, together with other homeowners and persons with direct interest in the stakes of the Poppleton neighborhood.

> **3.      The Individual Appellants Have Pleaded a Viable Nuisance Claim**

The Court also should reverse the dismissal of Appellants' nuisance claim. The Individual Plaintiffs alleged that the contract between the City has caused a 13.8 hole in their neighborhood and the lack of use, occupancy and care has caused, and will continue to cause, a nuisance that harms Appellants. The Complaint explains that the land sits empty and fallow, which has resulted in the accumulation of trash, weeds, rats, illegal dumping and other harms typical of land that is unoccupied, undevelopable (due to the LDDA) and uncared-for in an urban environment.  JA039, ¶98.  The Individual Appellants have pleaded that living adjacent to these conditions causes them to lose use and enjoyment and property value.  JA039, ¶98.

These allegations are more than sufficient to plausibly allege a nuisance claim under Maryland law. The district court's order misstates Maryland nuisance law and fails to apply the correct standard of review when determining that Appellants have failed to plead nuisance. Maryland nuisance law allows recovery for nuisance even when a physical use of the property has not been directly impaired, and determinations about the significance or reasonableness of Appellants' alleged loss of use and enjoyment or loss of property value require an evaluation of evidence that cannot be decided solely on the pleadings. Accordingly, this Court should reverse the district court's dismissal of the nuisance claims under Federal Rule of Civil Procedure 12(b)(6).

### 4.    Appellants Have Pleaded a Viable Case for Declaratory Judgment, Which the District Court Overlooked.

The district court did not address Appellants case for declaratory judgment, which was Count VII of the Complaint. Appellants claim for declaratory judgment was brought both under 42 U.S.C. §1983, and as a result of there being a controversy ripe for determination by the Court—namely the enforceability of the LDDA and/or its "Developer's Right" provisions. JA068-JA072. Appellants easily demonstrate standing to seek a declaratory judgment.

-11-

## VI.    ARGUMENT

### 1.    Appellants Have Article III Standing Because They Have Pleaded Facts Demonstrating that They Experience Direct and Special Harm Traceable to the LDDA that Would Be Remediated by Court Order.

The district Court ruled that Appellants lack Article III standing. Appellants have Article III standing to challenge the LDDA under a trove of federal cases influencing and interpreting the three-part test in *Lujan v. Defender's of Wildlife*, 504 U.S. 555 (1992), as well as through direct application of the *Lujan* test to the allegations in the Complaint.

Under Article III of the United States Constitution, a plaintiff who seeks relief in federal court must demonstrate standing. Article III standing has not been a static doctrine, and standing is not intended to be a surreptitious route to deny a claim on the merits at a threshold stage. *See generally, Wright & Miller, Fed. Prac. & Proc.* 13A, § 3531.1 (3d ed. 2008). The standing doctrine developed substantially during the last century. Before federal and Maryland courts expanded the standing analysis to accommodate aesthetic and environmental concerns, an allegation of physical proximity or adjacency to the alleged harm was deemed important to establishing standing. *See generally, id.; see also Patuxent Riverkeeper v. Maryland Dep't Env't*, 422 Md. 294 (2011) (adopting broader *Lujan* standing as late as 2011, and moving Maryland away from a special aggrievement analysis based primarily on proximity).

The civil rights and environmental cases in the 1960's to 1980's expanded standing beyond physical proximity, allowing persons and organizations harmed by alleged unlawful actions of government to pursue claims so long as they were affected in a way that was different than the general public. *Fed Prac and Proc. Juris*, *supra*, § 3531.1. These cases, including cases specifically addressing neighborhood interests, buttress Appellants' standing in connection with the *Lujan* analysis. Indeed, as this Court has stated expressly, "[i]n the environmental litigation context, the standing requirements are not onerous." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003).

First, a Plaintiff need not have a pecuniary injury to her property to demonstrate standing, allegations of a non-economic injury, like an aesthetic harm, is enough. *Sierra Club v. Mortin*, 405 U.S. 727 (1972). In that case, Sierra Club brought suit to challenge a Forest Service project for the development of the Mineral King Valley by Walt Disney Enterprises. *Id.* at 730. The Court ruled explicitly that standing should be allowed by anyone whose recreational use or aesthetic appreciation of the valley would be impaired by Defendants. *Id.* at 738. *See also Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 154 (1970) (interest supporting standing "may reflect aesthetic, conservational, and recreational as well as economic values"). Here, Appellants similarly allege that the LDDA impairs both the aesthetic quality of their neighborhood and their property values.

The Supreme Court expressly extended standing to the character and quality of one's own neighborhood in *Havens Realty Corporation v. Coleman*, 455 U.S. 363 (1982). There, a black "tester" requested information from apartment complexes in Richmond, Virginia, to determine whether the apartment complex was violating the Fair Housing Act of 1968. *Id.* at 363. A unanimous Supreme Court ruled that the statute confers on all people the right to accurate data. *Id.* at 382. The Court further acknowledged that Plaintiffs who pled that they lived in the greater Richmond Metropolitan had a potentially cognizable injury stemming from their right to live in an integrated community free from discrimination. *Id.* at 377. Although the Court regarded the entire Richmond Metropolitan area as perhaps too broad to confer standing on all of the individual Plaintiffs, the Court allowed Plaintiffs the opportunity to demonstrate on remand that they were in the general "neighborhood" of the apartment complex in question.

The *Havens Realty* decision approved neighborhood standing based on *Mortin* and another case decided three years earlier: *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979). In *Gladstone*, the Supreme Court adopted a broad interpretation of standing under the Fair Housing Act, holding that both municipalities and individual residents could bring suit for alleged racial steering practices by real estate firms. The Village of Bellwood was found to have standing due to potential economic harm and disruption of racial balance in its housing

-14-

market, while individual residents had standing based on the deprivation of social and professional benefits associated with living in an integrated community. Importantly, the Court rejected the district court's narrow view that only direct victims could sue, affirming that residents affected by discriminatory housing practices—even indirectly—could satisfy the injury-in-fact requirement for standing. *Id.* at 156.

Both *Havens Realty* and *Gladstone Realtors* stand for the principle—entirely supported by the *Lujan* analysis—that "[i]njury to the character of residential neighborhoods, although more intangible than many environmental injuries, commonly supports standing for plaintiffs who complain of acts that will affect the character of residential neighborhoods." *Wright and Miller, Federal Prac. & Proc.* § 3531.4 (3d ed.2008). This black letter law of neighborhood standing is supported by cases from across the federal appellate courts, including the following:

- *Society Hill Towers Owner's Ass'n v. Rendell*, 210 F.3d 168, 175-78 (3rd Cir. 2000) (holding that residents in a historic neighborhood surrounding the site of a proposed hotel and parking garage to be funded by an urban-development action grant had standing to complain noncompliance with environmental laws and hearing requirements and claimed injury through a "detrimental effect on the ambiance of their historic neighborhood," as well as declining property values);

-15-

- *Neighborhood Action Coalition v. City of Canton, Ohio*, 882 F.2d 1012, 1016-17 (6th Cir. 1989) (holding residents of a neighborhood association had standing to assert denial of their constitutional rights by municipal action that discriminated against their neighborhood by providing inadequate police protection and the resulting injuries included little or no police response to calls, deterioration of the neighborhood and property values);

- *South East Lake View Neighbors v. Department of Housing and Urban Development ("HUD")*, 685 F.2d 1027, 1034-35 (7th Cir. 1982) (holding standing and injury based on allegations that construction of a high-rise apartment building would increase traffic, noise and air pollution, population density and violent crime and decrease home values);

- *Neighborhood Development Corp. v. Advisor Council on Historic Preservation, HUD, City of Louisville*, 632 F. 2d (6th Cir. 1980) (holding that Plaintiffs who alleged that they "used" the aesthetic and architectural qualities of nearby buildings scheduled for demolition had standing to claim non-compliance with the NHPA, with the Court ruling that the class of protected interests that will establish standing cannot be restricted to economic interests);

- *Benton Franklin Riverfront Trailway and Bridge Committee v. Lewis*, 701 F.2d 784, 787 (9th Cir. 1983) (holding neighborhood association had standing to challenge the demolition of a historic bridge because its members appreciate the aesthetic beauty of the old bridge); and

- *Citizens Against Rails-to-Trails v. Surface Transp. Bd. ("STB")*, 267 F.3d 1144, 1149 n.4 (D.C. Cir. 2001) (holding an association had standing to advance challenges to a STB order permitting interim use of an abandoned railroad as a hiking trail because association members owned land adjacent to the right-of-way and claimed they would be directly impacted by the conversion of the land to a trail).

This Court also has expressly endorsed standing to address neighborhood aesthetic concerns. In *Waterford Citizens' Ass'n v. Reilly*, 970 F.2d 1287 (4th Cir. 1992), this Court addressed the standing of the Waterford Citizens' Association to challenge the EPA's decision not to reinitiate procedures under Section 106 of the National Historic Preservation Act ("NHPA"). *Id.* at 1289. Although this Court ultimately affirmed the District Court's determination that the citizens misinterpreted EPA's obligations under the NHPA, it nonetheless found standing based on the members interests in preserving historic character of the neighborhood where they lived. *Id.* at 1290. Here, Appellants similarly allege that the LDDA destroys the look and feel of their neighborhood.

-17-

In *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59 (1978), a case also first heard by this Court, the United States Supreme Court found standing based on proximity and probability of risk, even though Plaintiffs did not even allege an actual injury. Plaintiffs were nearby property owners who brought a constitutional challenge to the Price-Anderson Act, which limited liability for nuclear accidents. The Court held that the plaintiffs—residents living near a proposed nuclear power plant—had standing because they demonstrated a concrete injury: the increased risk of harm from nuclear operations and the potential inadequacy of compensation under the Act. *Id.* at 80-81. To be sure, the risk of possible harm/redress is less than what Appellants have pled in this case.

After *Lujan* (1992), this Court has found standing in at least four cases where persons with far less proximity and aggrievement than Appellants sought a court order to alleviate an actual or perceived harm. In each of these cases, the harm was based on aesthetics and perceived environmental concerns, as opposed to Appellants who validly have pled these concerns together with economic injuries.

In a frequently cited case applying *Lujan*, this Court ruled that allegations of aesthetic enjoyment and recreational use confer standing. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th Cir. 2000). In *Gaston Copper*, this Court conducted a detailed analysis of Article III standing in a Clean Water Act citizen suit. The Court reversed the district court, holding that the individual

plaintiffs and environmental organizations had standing through their members who lived near the polluted waterway. *Id.* at 161. One member and individual plaintiff, who lived near a lake four miles downstream of the discharge, testified that his recreational use of the lake had declined due to reasonable fears of pollution from Gaston Copper's permit violations. *Id.* at 158. The Court emphasized that injury-in-fact can be established through credible evidence of diminished use and enjoyment of nearby resources beyond the four-corners of one's own property. *Id.* at 157. Beyond this, the Court also reconfirmed that threats or increased risk constitutes cognizable harm. *Id.* at 160.

This Court reached a similar conclusion in *1000 Friends of Maryland v. Browner*, 265 F.3d 216, 225-26 (4th Cir. 2001). There, this Court ruled that an association whose members could be exposed to motor vehicle emissions had standing to challenge EPA approval of a motor vehicle emissions budget for Baltimore, because (a) the budget would be relied upon by public agencies in reviewing and approving funding for highway projects that the association claimed would prevent attainment of air quality standards; (b) injury would be caused by approval of the emissions budge; and (c) an order setting aside the budget would redress the injury. *Id.* The members only lived near the Baltimore area.

Two years later, this Court allowed a canoe association with an even softer connection to have standing to challenge a swine waste discharge that could not even

be shown to harm the river (only Plaintiffs perceptions of harm). *American Canoe Ass'n*, 326 F.3d at 516–520. Once in 1966, and again in 1997, the defendant accidentally discharged swine waste into a river. *Id.* Because other farms also had discharged wastes into the river, there was no showing that any harm to the river was caused by the defendant's discharges. *Id.* But members of the plaintiff associations described the impact of the discharges on their use and enjoyment of the river. *Id.* One member, who lived four miles downstream from the defendant, complained that his family's use of the river for swimming, drinking, and fishing had been curtailed because of increased darkness and algae, the reduction of the fish population, dead fish, and a foul order. Applying the *Lujan* test and the member's proximity and use, the Court found standing for claims of only perceived harm.

More recently, this Court again confirmed the value of physical proximity when undertaking the *Lujan* analysis in connection with a challenge to a government action, easily finding standing for Sierra Club in *Sierra Club v. United States Dept. of Interior*, 899 F.3d 260 (4th Cir. 2018). In this case, this Court determined that environmental organizations had associational standing to file a petition seeking judicial review of right of way issued by National Park Service (NPS) allowing natural gas pipeline to drill and pass underneath a parkway surface, even though NPS did not manage forest visible from parkway. *Id.* at 285. Organization members pleaded that they regularly used and enjoyed parkway and its scenic views and

-20-

intended to visit it in future, that the pipeline's construction and maintenance corridor in forest would be visible from an overlook and lessen parkway's aesthetic value, and one member of the organization owned home near where construction was expected to occur. *Id.* at 283-85. Plaintiffs alleged that a government action to permit the pipeline would cause their injury and that a court order in their favor would prevent the pipeline in its existing form. *Id.* In ruling that Plaintiffs had standing, this Court reiterated that it is not strictly necessary for Petitioners to show "'that a favorable decision will relieve [their] every injury,'" and reaffirmed that "the removal of even one obstacle to the exercise of one's rights, even if other barriers remain, is sufficient to show redressability." *Id.* at 284-85 (quoting and citing *Larson v. Valente*, 456 U.S. 228, 242-44 & n. 15 (1982)). Certainly, if plans to visit a scenic highway can confer standing, Appellants have standing to challenge a governmental action affecting the aesthetic qualities of land adjacent to their home.

Prior to turning to the *Lujan* analysis, the Maryland Supreme Court in *120 W. Fayette St. LLLP v. Mayor and City Council of Baltimore*, 407 Md. 253 (2009), ruled that Plaintiffs have standing based on proximity in a case remarkably on all fours with Appellants' action. In this case, 120 West Fayette St. sought a declaratory judgment against Baltimore City, alleging that a land disposition agreement ("LDA") between Baltimore Development Corporation ("BDC") and a particular developer was illegal and ultra vires, because the City violated its Charter and laws

-21-

by entering into the illegal LDA. *Id.* at 268. 120 West Fayette Street's property was outside of, but immediately adjacent to the LDA area, and its main concerns related to business-competition. *Id.* at 269. Like Appellants, 120 West Fayette Street sought a declaratory judgment that the LDA was illegal and therefore unenforceable. *Id.* at 273. Addressing the issue of standing on appeal, the Maryland Supreme Court ruled that 120 West Fayette Street was specially aggrieved based on its proximity to the LDA site. *Id.* In so holding, the Maryland Supreme Court ruled on standing outside of the taxpayer standing rubric (which was also presented), to determine that these adjacent property owners were "specially aggrieved" in a manner different than the general public. *Id.* at 269-273. The Maryland Supreme Court also determined that they had presented a case and controversy sufficient to entitle them to declaratory judgment on the enforceability of the LDA. *Id.* at 273.

With the benefit of this history and context, *Lujan*, 504 U.S. at 560-561, provides the three-prong test used by most federal courts to assess standing. First, the plaintiff must demonstrate an "injury in fact," meaning a harm that is concrete, particularized, and actual or imminent—not conjectural or hypothetical. *Id.* Second, there must be a causal connection between the injury and the challenged conduct, such that the injury is "fairly traceable" to the defendant's actions and not the result of independent actions by third parties. *Id.* Third, it must be "likely," rather than merely speculative, that the injury will be redressed by a favorable court decision.

*Id.* These criteria ensure that federal courts only hear cases where plaintiffs have a genuine, personal stake in the outcome, rather than a generalized grievance shared by the general public. *Id.*

*Lujan* drew from many of the Supreme Court cases discussed above, but placed an outer limit on the concept of an environmental harm. Defenders of Wildlife claimed standing to challenge a regulation that limited the geographic scope of the Endangered Species Act to only the United States. *Id.* at 563. Applying the three-part test, the Court ruled that the plaintiff environmental organizations lacked standing because animals in Africa are too far afield and created only a cognizable interest of plaintiffs instead of an actual injury to plaintiffs themselves. *See id.*, *citing Sierra Club v. Morton*, 405 U.S. 727, 734-735 (1972).

Because *Lujan* survived a motion to dismiss and was appealed from summary judgment, the Supreme Court had the benefit of two affidavits of organization members claiming that the government's regulations would impact their intention to observe endangered animals at some non-descript, unknown time in the future. *Id.* at 563-564. The Supreme Court rejected the proposition that "anyone who observes or works with an endangered species, anywhere in the world, is appreciably harmed by a single project affecting some portion of that species with which he has no more specific connection." *Id.* at 567.

-23-

While *Lujan* placed understandable limits on standing for environmental group members who might someday view animals in Africa, *Lujan* cannot be read to deny adjacent property owners standing to challenge an allegedly improper government action. Indeed, even when applying *Lujan*, in *Gaston Copper* (2000), *Browner* (2001) and *American Canoe Ass'n* (2018), this Court expressly authorized lawsuits by organizations based only on their interest in recreating in a river, enjoying a scenic bypass or breathing cleaner air, as well as their belief that a court order could alleviate, at least partially, their perceived/potential aesthetic harm. Appellant's allegations and proximity to the harm exponentially surpass the allegations in these cases by several orders of magnitude.

Beyond all of this authority on Article III standing, Appellants allegations easily satisfy the *Lujan* test. Appellants allege that they live <u>adjacent</u> to the LDDA area and that they must look at the 13.8 acres of barren wasteland caused by the LDDA with this developer. JA039, ¶98. They have provided a pictures to explain the condition and their proximity to it. JA039, ¶98. Appellants plead aesthetic and neighborhood harms, JA020, ¶19; JA021, ¶22; JA039, ¶98, as well as loss of use and enjoyment of their homes as result of the wasteland created by the unconstitutional arrangement and contract, and the neighborhood cannot move forward because of developer cloud caused by the LDDA. *See, e.g.,* JA025, ¶28.

-24-

Next, Appellants alleged that their injury is traceable to the unlawful transaction and LDDA with this developer, which resulted in the taking and destruction of more than 500 private homes and caused the nothingness that remains now after almost two decades. *See, e.g.,* JA024-JA025, ¶26. Appellants further assert that the creation of a "Developer Right" over all 13.8 "taken" acres—as a purely private inurement and without the delivery of any public use or other value—is not allowed to exist, and it clouds title to the land, further preventing the City or anyone else from delivered anything of value on the land. JA020, ¶19; JA021, ¶22; JA039, ¶98. Appellants assert that the situation has become so upside-down, that the City is now paying the Developer the fair market value for the land the City "took" and owns, and the City's acquiescence to this arrangement has only emboldened the Developer to bolster his claim to a perpetual right to control all of the land or else be paid the full value of it. *See, e.g.,* JA021, ¶22 and JA024, ¶26. All of this deeply harms the neighborhood and the Appellants.

Finally, Appellants alleged and assert that a Court order determining enforceability of the LDDA or the rights lawfully conferred (or not) thereunder would substantially alleviate the alleged harms—from the lack of aesthetic/social character of the neighborhood to the loss of property value. *See* JA068.

Unmistakably and on the strength of this trove of authority, Appellants—as adjacent property owners directly impacted—have standing to bring these claims, and this Court should reverse and remand the district court's order.

### 2. Appellant Poppleton Now Has Associational Standing.

Poppleton Now also has standing to bring this lawsuit for the same reasons as the Individual Plaintiffs and for the additional reasons that follow.

An association has standing "to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180, (2000); *citing Hunt v. Washington State Apple Advertising Com'n,* 431 U.S. 333, 343 (1977). In *Hunt,* the U.S. Supreme Court noted that if the association seeks a declaration or an injunction that is favorably granted by the court, "the remedy…will inure to the benefit of those members of the association actually injured." 431 U.S. at 343. (citing *Warth v. Seldin,* 422 U.S. 490, 515 (1975)). *See also Patuxent Riverkeeper*, 422 Md. at 299-300 (adopting *Laidlaw* and *Lujan*).

In *Laidlaw,* environmental groups brought an action under the Clean Water Act against a defendant who bought a wastewater treatment plant and was granted a permit to discharge treated water pollutants to a river within certain limits. *Laidlaw,*

528 U.S. at 167.  The U.S. Supreme Court held that the environmental group had standing because its members' affidavits attested that they once "picnicked, walked, birdwatched, and waded in" the river, but now no longer engage in those activities due to the polluted and dilapidated river. *Laidlaw,* 528 U.S. at 181-183 (finding that the sworn statements document that the "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity") (citing *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)). *Accord* Gaston Copper, 204 F.3d at 49 (4th Cir. 2000); *Browner*, 265 F.3d at 226 (4th Cir. 2001) (discussed *supra*).

Poppleton Now is a not-for-profit Maryland corporation with a primary purpose of "bettering the Poppleton neighborhood and advocating for the rights and desired uses of current and former neighbors, especially those who have been displaced and had their homes taken by the acts of the Defendants." JA027, ¶41. Not only does Poppleton Now have members not named in its Complaint who would have standing on their own right, but each of the named Plaintiffs in this case is also a member of Poppleton Now. JA027 ¶¶42-43.

- Sonia Eaddy is the current president of Poppleton Now. JA027, ¶42.
- The Walkers and Gunns are current members of the organization, with

Mrs. Walker as an elected board Member and Yvonne Gunn as a past president and current member. JA027, ¶¶43-44.

Similar to the environmental organization's members in *Laidlaw* that attested to their once thriving and recreationally used river, the members of Poppleton Now, including Individual Plaintiffs, have pleaded that the LDDA has deprived them of use and value of their homes, and erased the social and structural capital and fabric of this community.[3]  Where Poppleton Now members once walked down the street to visit friends and family members, they now confront emptiness, poorly kept grass/cement lands that tear at the social and aesthetic fabric of the community.

Poppleton Now is asserting relief that is germane to the organization's purpose. As stated above, the heartbeat of Poppleton Now centers around advocating for the rights of the current and former neighbors. JA027 ¶41.  Poppleton Now holds regular meetings in the Poppleton neighborhood.  JA027 ¶41-44.  Revitalizing the neighborhood is not a mere interest of this community development organization and its membership, it is its purpose.

The relief requested by Plaintiff Poppleton Now can be achieved and can benefit the membership without making every member an individual party to this

---

[3] These allegations also hold true for the Poppleton Now members who remain members of the community.  Poppleton Now also has members whose homes actually were taken for the LDDA and who remain members of the organization.

suit.[4]  Poppleton Now's members want to see a public use and believe ending this unlawful and unconstitutional relationship with this Developer is a first step to securing a better future.  No public use will occur so long as the Developer continues to assert his unlawful "development right" and continues to demand full market value payment for every parcel that is developed by anyone other than him (including the City of Baltimore or HABC).  JA043-JA048, ¶¶99-125.  Although Poppleton Now has other members who could participate individually in a lawsuit, as well as members who have had their homes taken, the members, as well as the neighborhood generally, will benefit substantially from the declaratory, injunctive and other relief sought in the Complaint.  JA027, ¶41.

For the reasons set forth herein regarding associational standing, and for the additional reasons set forth in the prior section concerning Individual Standing, Poppleton Now has standing to bring the actions asserted on this appeal.

### 3. The Individual Property Owners Have Validly Pled a Case of Nuisance against the City and the Developer.

Plaintiff have sufficiently pleaded a case of nuisance, and the district court erred in its interpretation of Maryland law, as well as in its application of the motion to dismiss standard.  The court must assume the truth of the allegations and "draw

---

[4] For clarity, Poppleton Now does not join in the nuisance action filed by the Individual Plaintiffs.  *See* JA067, ¶192 (limiting the claim of damages to the individual Plaintiffs.

-29-

all reasonable inferences" in favor of the complainant. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). Importantly, the strength of the plaintiffs' proof should not be considered at the motion to dismiss stage, before any opportunity for discovery. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015) ("The strength of the plaintiff's allegations is not to be tested at this stage; instead, the court must accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor.")

A private nuisance is an unreasonable and substantial interference in the use and enjoyment of land by another person. JA066, ¶185. Damages for nuisance often sound in the loss of use and enjoyment or loss of market value of property. JA066, ¶186.

Appellants allege that Baltimore City owns the 13.5 acres subject to the LDDA and that Developer asserts an equitable right over that same land, which is preventing the delivery of a public use or any acceptable development of this land. JA020-JA024, ¶¶19-23. Appellants allege that it is unreasonable to core out 13.5 acres of a neighborhood only to leave the land empty and fallow to accumulate weeds, trash, rats rubble, illegal dumping and other problems. JA067, ¶¶190-192. By maintaining these unreasonable conditions, the City and Developer are causing Appellants to lose the use and enjoyment of their homes and their property value, and Appellants each provided detailed accounts of how and why this occurs, as well

-30-

as how these conditions prevent their homes from accreting market value.  JA027, ¶41.

On these allegations, as well as testimony that would be developed, a reasonable trier of fact easily could conclude that no owner should have to face such a sight and that creating the circumstance where 13.8 acres of land stagnates with no occupancy in an urban environment creates nuisance conditions.

The district court deviated from the pleading standard because it evaluated the degree of the reasonableness of Plaintiff's allegations and sensibilities, which goes to the weight of evidence and not the sufficiency of the allegations.  *See* JA426-427.

Next, the district court placed undue weight on the Plaintiff's inability to use his or her own property for a particular purpose.  In developing a heightened standard of lost use that does not exist under Maryland law, the district court misinterpreted the holding of *ExxonMobil v. Albright*, 433 Md. 303 (Md. 2013).

In *ExxonMobil v. Albright*, in which undersigned lead counsel participated in both the trial and appeal, the Maryland Supreme Court confronted whether property owners more than a mile away with no contamination in their well could maintain a cause of action for nuisance for the mere stigma caused to the neighborhood by the release of 26,000 of gasoline from a nearby station.  After a six-month jury trial and volumes of evidence presented and contained in the record extract before the Maryland Supreme Court, the Court concluded that Plaintiffs without any

contamination in their wells failed to state a claim for nuisance. *Id.* at 411. As a practical matter, Plaintiffs adjacent to the station (those factually analogous to Appellants here) in that case were not impacted by this ruling because all had contamination in their wells.  The *Albright* ruling (used by Justice Harrell to draw lines involving Plaintiffs 1-2 miles away) has no bearing on the rights of these Appellants, who plead harm caused by adjacent property.

In contradiction to its own ruling, the district court cites *Nat'l Fair Housing Alliance v. Bank of America*, 401 F. Supp. 3d 619 (D. Md. 2019).  In the parenthetical quoted by the district court, it notes that the Plaintiff there had pleaded that "routine commotion from squatters next door" and "a rat-infested garage next-door" were sufficient to demonstrate an interference with the ordinary comfort and enjoyment of the home. JA428. Those allegations are nearly identical to those in Appellants' Complaint.  It is difficult to ascertain how these allegations could be sufficient while Appellants' fall short. Considering reasonableness or degree of harm goes to evidence and are not appropriate questions for a motion to dismiss.

Appellants have sufficiently pleaded a nuisance claim and this Court should reverse the district court's Rule 12(b)(6) dismissal. Should the Court determine that Appellants truly have not pled a nuisance, then Appellants should be entitled to amend the Complaint because their claims for nuisance are genuinely-felt, substantial, reasonable and actionable.

**4.     The Court Failed to Address Appellants' Claims for Declaratory Relief, which is the Crucial Relief Sought**

The District Court did not address Appellants' case for declaratory judgment, which was Count VII of the Complaint. Appellants' claim for declaratory judgment was brought both under 42 U.S.C. §1983, and as a result of there being a controversy ripe for determination by the Court—namely the enforceability of the LDDA and/or its "Developer's Right" provisions under various provisions of the United States' and Maryland's constitutions and laws. JA068, ¶¶203-04.

The District Court failed to analyze Claim VII for standing, as it is required to do. *See Town of Chester, N.Y v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017) (requiring the standing analysis on each claim). Had it done so, it would have easily found standing for all of the reasons previously discuss. Indeed, most of the cases previously cited for standing involved requests for declaratory relief against a governmental action. *See*, *supra*, Section VI.1.

Of particular note on the topic of declaratory judgment, Appellants are almost identically situated for standing as the Plaintiffs who challenged a Baltimore City LDA regarding property across the street from them in *120 West Fayette Street*, 407 Md. at 273. In that case the Maryland Supreme Court specifically analyzed standing under a stricter standard than *Lujan*, and applied it to the question of whether adjacent property owners could request a declaratory judgment to strike down an LDA between the City and a developer. *Id.* at 269. Not only did the Court determine

-33-

that the trial court erred by finding no standing and that the adjacent property owners were specially aggrieved in a way different than the general public, but it went further to obligate the trial court to render a declaratory judgment on remand. *Id.* at 273 ("[B]ecause the Circuit Court erred in granting the City's motion to dismiss on the basis that 120 West Fayette lacked standing, we conclude that it also erred in failing to provide a declaratory judgment pursuant to 120 West Fayette's request").

For these reasons, the Court should hold that Appellants have standing to bring its declaratory judgment claim and reverse the dismissal on Rule 12(b)(1) grounds (assuming this was the district court's basis).

## VII.  CONCLUSION

For the reasons stated herein, Appellants respectfully request that this Court reverse the district court's order dismissing the case and remand the case to the district court for proceedings consistent with the scope of this appeal.  In the alternative, Appellants minimally should be afforded an opportunity to amend their Complaint.  Appellants expressly request oral argument on this matter.

-34-

Dated: August 18, 2025                   /s/ Thomas K. Prevas

SAUL EWING, LLP
Thomas K. Prevas
1001 Fleet Street, 9th Floor
Baltimore, MD 21202
(410) 332-8683
thomas.prevas @saul.com

Katherine S. Barret Wiik
33 South 6th St,
Minneapolis, MN 55402
katie.barrettwiik@saul.com

*Counsel for Appellants Poppleton Now,
Curtis Eaddy Sr. & Sonia Eaddy; Sterling
Walker & Francina Walker and William
Gunn & Yvonne Brooks Gunn*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) because it contains  8,113  words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(i).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Work in 14 point Times New Roman.

 */s/ Thomas K. Prevas*___
Thomas K. Prevas

## REQUEST FOR ORAL ARGUMENT

Appellants hereby request oral argument.

-37-

## CERTIFICATE OF SERVICE

I CERTIFY that on August 18, 2025, the Brief of Appellant and the Joint

Appendix was served on all parties or their counsel of record through the CM/ECF

system.

*/s/ Thomas K. Prevas*
Thomas K. Prevas
